## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LEVINA WONG, | |
| Plaintiff, | |
| v. | Civil Action No. |
| VESON NAUTICAL LLC and SEAN BRIDGEO, | |
| Defendants. | |

## VERIFIED COMPLAINT

Plaintiff Levina Wong ("Ms. Wong") brings this action for damages against Defendants Veson Nautical LLC ("Veson" or the "Company") and Sean Bridgeo ("Bridgeo") (collectively, "Defendants") for: (1) intentional infliction of emotional distress; (2) violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (3) violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 1201 *et seq.* (the "ADA"); (4) violation of the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B ("Chapter 151B"); (5) violation of the Massachusetts Earned Sick Time Law, Mass. Gen. Laws ch. 149, § 148C; (6) violation of the Massachusetts Paid Family and Medical Leave Act, Mass. Gen. Laws ch. 175M (the "PFMLA"); and, (7) tortious interference with advantageous business relations. In support of her claims, Ms. Wong states as follows:

## PARTIES

1.      Plaintiff Levina Wong is an individual who resides in Newton, Massachusetts.

2.      Defendant Veson Nautical LLC is a Delaware limited liability company with its principal place of business at 21 Drydock Avenue, Suite 610W, Boston, Massachusetts, 02210.

3.      Defendant Sean Bridgeo is an individual who, upon information and belief, resides in Lexington, Massachusetts. Bridgeo is (and was at all relevant times) the Chief Financial Officer ("CFO") of Veson.

## JURISDICTION AND VENUE

4.      This Court has personal jurisdiction over each of the Defendants because Veson has its principal place of business in Massachusetts and, upon information and belief, Bridgeo is domiciled in Massachusetts.

5.      Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because the allegations in Count II state a federal cause of action against Veson under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the allegations in Count III state a federal cause of action against Veson under the Americans with Disabilities Act of 1990, 42 U.S.C. § 1201 *et seq.* This Court has supplemental jurisdiction over all other state law claims alleged herein pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper in the United States District Court, District of Massachusetts pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### *Background of the Parties*

### Ms. Wong

7.      Levina Wong is a successful attorney, with over 22 years of professional experience.

8.      After graduating and receiving multiple degrees from Cornell University (Bachelor of Science, Electrical Engineering; Master of Engineering, Electrical Engineering; and

Juris Doctor), Ms. Wong was employed as an attorney, first as an Associate at Ropes & Gray, LLP, and then in various in-house roles before joining Veson.

9.      Ms. Wong began working for Veson in March 2020 as its inaugural Vice President, General Counsel ("GC"). As of December 2020, Ms. Wong became the Company's Chief Privacy Officer as well.

10.      In April 2023, Veson promoted Ms. Wong from Vice President to Senior Vice President. In connection with her promotion, Ms. Wong asked for a raise commensurate with her new title and duties that would place her compensation in line with other comparable GCs, but Veson rejected this request.

11.      Ms. Wong held the positions of Senior Vice President, GC, and Chief Privacy Officer until July 3, 2024, her last day of employment with Veson.

**Veson and Bridgeo**

12.      Veson develops, implements, and supports the solutions that propel maritime commerce including, but not limited to, products for maritime shipping digitalization.

13.      At all relevant times, Veson employed 50 or more employees for 20 or more weeks of the preceding calendar year. As such, Veson was an "employer" within the meaning of Title VII, the ADA, Chapter 151B, the Massachusetts Earned Sick Time Law, and the PFMLA.

14.      When she joined Veson, Ms. Wong was a legal team of one. Under her leadership and guidance, Veson's legal department grew to a team of five legal professionals by the time of her forced departure (discussed below) from the Company.

15.      When she started working for Veson in March 2020, Ms. Wong reported directly to Tim Strudwick (male), who was then the Company's CFO.

16.      After Strudwick resigned from Veson in June 2022, Ms. Wong began reporting

directly to John R. "Sean" Riley, Jr. (male), the Company's President and Chief Operating Officer ("COO"), and he continued to be her direct supervisor for the rest of her time at the Company. Throughout her employment at the Company, Ms. Wong reported indirectly to John Veson (male), the Company's founder and Chief Executive Officer ("CEO").

17.     Following Strudwick's departure from the Company, Sean Bridgeo (male) was hired as a C-suite executive and officer of the Company, taking over the open CFO role.

18.     Ms. Wong and Bridgeo frequently worked together as co-workers on various matters as members of the Company's senior leadership team. It is (and was at all relevant times) an essential function of Ms. Wong's role as GC to work collaboratively with the CFO. Consequently, Ms. Wong endeavored to cultivate and maintain a friendly and professional demeanor and relationship with Bridgeo (and other Veson employees).

19.     Kerry Unflat (female) was hired in or around October 2023 as the Company's Chief People Officer ("CPO") to oversee Veson's human resources ("HR") function. Upon information and belief, Unflat had previously worked under Bridgeo's direct supervisory authority while at a previous company, and Bridgeo had introduced Unflat to Veson as a candidate for the position of Veson's CPO.

20.     At all times relevant to the events detailed below, Bridgeo, Unflat, and Ms. Wong reported directly to Veson's COO (Riley).

21.     At all relevant times, Ms. Wong was a qualified employee, and her performance was satisfactory and met or exceeded expectations.

22.     Throughout Ms. Wong's tenure at the Company, Ms. Wong was well-regarded by her peers and direct reports. Of note, she was regarded as "highly organized and analytical" and scored highest in the category of "Communication" in her most recent (May 2024) performance

evaluation.

23.     To her knowledge, Ms. Wong was never the subject of any workplace conduct investigation at Veson, nor was she ever alleged to have violated any Company policy.

### *Bridgeo's Discriminatory Conduct Based on Ms. Wong's Sex*

24.     As discussed below, Bridgeo unlawfully harassed and discriminated against Ms. Wong because she is a woman and, when she complained, Veson and Bridgeo retaliated against her and drove her from the organization by creating an intolerable working environment and refusing to accommodate basic requests for assistance.

25.     Bridgeo commented on multiple occasions during Ms. Wong's time at Veson (including in fall 2022, spring 2023, and fall 2023) that this (referring to his role as Veson's CFO) was the first time he had been a CFO for a company where the legal department and the human resources departments did ***not*** report to him. When doing so, Bridgeo mentioned that the GCs he had hired in the past were all women, and that they all worked *for* him – signifying that he (1) was accustomed to holding a superior position to female attorneys in his prior roles, (2) resented that he did not have the same authority at Veson, and, (3) expected Ms. Wong to fall in line.

26.     Those were not the only occasions when Bridgeo's attitude that women should be reporting *to him* was displayed.

27.     For example, in the spring of 2023, Bridgeo asked a female attorney on Ms. Wong's legal team to print out documents for him, as though she should function as his assistant when he wished, despite being a lawyer on Veson's legal team. These documents were unrelated to any legal matter – Bridgeo simply had not set up his printer (despite having been with the Company for over six months) and wanted someone else to do this menial task for him.

28.     Veson employees have the ability to print to the network printers from virtually

anywhere. Therefore, Bridgeo could have emailed the file to anyone else on his own team, including those working remotely, and asked them to print the file on a printer just steps away from his desk.

29.    Ms. Wong later met with Bridgeo to explain that requesting that a female attorney do this low-level administrative task (that was unrelated to legal support) for him was inappropriate and exhibited unconscious gender bias. He was defensive and made clear with his reaction that did not appreciate being corrected or understand why this was demeaning to the junior female attorney.

30.    Bridgeo demonstrated through these types of comments and his behavior that he was uncomfortable working with women at his level of authority or leadership and preferred that women work in subordinate positions to him. He also demonstrated that efforts to challenge his behavior would be met with a negative response.

31.    Beginning in or around May 2023 and shortly after Ms. Wong was promoted to the Senior Vice President level, Bridgeo began to actively and persistently undermine Ms. Wong in her role, usurp her responsibilities, and diminish her authority as the Company's GC. Upon information and belief, he did so because of her sex (female).

32.    As the Company's former GC, Ms. Wong takes her confidentiality obligations to the Company very seriously and, as such, has not included any details in this publicly-filed Verified Complaint that she believes may implicate the Company's attorney-client privilege. As a result, out of an abundance of caution, she has not provided details here concerning many instances in which Bridgeo (and later Unflat and HR acting, upon information and belief, at Bridgeo's direction) worked pervasively to undermine her authority, but she will do so in a supplemental filing, under seal or as otherwise directed by the Court, in a manner that protects the Company's

privilege, should it wish to assert it.

33.     Suffice it to say that Bridgeo consistently sought to exclude Ms. Wong from important decisions and communications within the purview of the legal department in a subtle but persistent campaign to undermine and sideline her.

34.     Upon information and belief, Bridgeo later encouraged Unflat and other members of the HR department to exclude and undermine Ms. Wong and members of her team in a similar fashion because of Ms. Wong's sex, as explained below.

[*Paragraphs 35-47 omitted pending resolution of any confidentiality or privilege concerns the Company may have.*]

### Defendants' Unlawful Conduct Concerning Ms. Wong's Medical Leave in October/November 2023

48.     Ms. Wong was scheduled to take ten (10) days of sick leave (a combination of statutory and other earned sick leave) to have surgery related to her own serious health condition (cancer) in late October and early November of 2023.

49.     In the weeks leading up to her scheduled sick leave, she worked with her team and the COO (to whom she and her team reported) to transition matters appropriately.

50.     On the afternoon of October 26, 2023, her last day in the office prior to the surgery, Bridgeo came into her office to say, "Although they don't report to me, I am happy to meet with your team while you are out."

51.     Much like his multiple comments concerning how his prior GCs had reported *to him,* this was another a veiled threat - in this instance, a threat to take over Ms. Wong's team and diminish her professional responsibilities. Upon information and belief, this was also further evidence that Bridgeo believed that, as a woman, she could not manage her personal and professional obligations without his assistance.

52.     Bridgeo's threat substantially interfered with Ms. Wong's sick leave.

53.     Indeed, Ms. Wong was so worried that Bridgeo would effectively oust her while she was recovering that she was back in communication with her team within a few days rather than focused on her recovery.

54.     Upon information and belief, Bridgeo did not engage in this type of undermining behavior with any of the senior male employees at Veson. Notably, other senior male employees have taken months of family leave and Bridgeo, upon information and belief, did not similarly attempt to insinuate himself into their respective areas of responsibility during their leaves.

### Bridgeo's Undermining Conduct on the Basis of Ms. Wong's Sex Continues

[*Paragraphs 55-78 omitted pending resolution of any confidentiality or privilege concerns the Company may have.*]

### Ms. Wong Raises Concerns About A Rat Infestation at Veson's Proposed London Office

79.     Bridgeo's earlier unlawful conduct paled in comparison to an extremely distressing, threatening, and malicious incident that he orchestrated in early 2024 to silence Ms. Wong as a voice in the workplace.

80.     By way of background, during the week of January 22, 2024, Veson's Global Sales Meeting convened in London.

81.     Bridgeo led a group of Veson employees on a tour of several potential locations for the Company's anticipated new London office, which would allow the Company to consolidate its two existing London offices.

82.     Bridgeo invited Ms. Wong to join the tour, as she was also in London to attend the Global Sales Meeting. Several senior-level employees, including three Vice Presidents, two Senior Vice Presidents (including Ms. Wong), and Bridgeo were on the tour.

83.     At one potential site, the group toured three spaces: two finished (and occupied with current tenants) and one unfinished (and unoccupied). During the tour of that site on or about Monday, January 22, 2024, Ms. Wong noticed that many rodenticide stations had been set up throughout the spaces. Rodenticide stations in such quantities and in such obvious places were not prevalent in any of the other spaces that Ms. Wong had toured with the group.

84.     Ms. Wong was concerned that the presence of so many poison stations was an indication that the building had a major rat infestation, and she flagged this for Bridgeo and other members of the group as a problem with selecting that site for the office. Among other issues, such an infestation would pose a health hazard to Veson's employees and visitors, and it likely would take significant time and expense to fully eradicate.

85.     Rather than take Ms. Wong's concerns seriously, Bridgeo laughed off the issue. He dismissed her claims in front of the assembled group of the senior leaders, shrugging off her concerns by stating that there were rats all over London.

86.     Ms. Wong responded that she understood, but that the prevalence of rodenticide stations in that site was particularly concerning. She further pointed out that the hotel where they were all staying that week was likewise close to the Thames River, but that no such rodenticide stations were in their rooms.

87.     Bridgeo and/or others in the group, following Bridgeo's lead, also teased Ms. Wong and asked her whether she was scared of rodents, implying that she was a stereotypical woman.

88.     Despite the demeaning comments, Ms. Wong remained professional and pleasant during these discussions.

89.     At a meeting following the completion of the office tours, Bridgeo and the rest of the group decided to present two (2) sites to the COO and CEO as viable options for the new, consolidated London office. Over Ms. Wong's objections, the group decided (in her presence) that the problematic (likely infested) building along with one other would be presented, and Bridgeo and the realtor would schedule tours for the COO and CEO later in the week. Ms. Wong once again voiced her concerns and was laughed off by Bridgeo.

90.      The following day (Tuesday, January 23, 2024), during a break in the Global Sales Meeting, Ms. Wong had a quick conversation with the COO (Riley) about the upcoming offices he would tour with Bridgeo later that week. She described the rodenticide stations at one of the proposed sites and her concerns that it indicated an infestation and a potential risk for the Company. At that time, Riley conveyed that he understood her concern.

91.     On Wednesday, January 24 2024, Ms. Wong received a Slack message from Bridgeo, directing her not to discuss the rodenticide boxes with "people." She understood "people" to include Veson's CEO and COO and asked Bridgeo to confirm her understanding, which he did. Bridgeo then mischaracterized her concerns about the potential office site, stating "…since one of the units on the short list had a mouse, that is not a reason to dismiss it." Ms. Wong clarified that she had not seen a mouse and, again, reiterated her concerns about a possible infestation based on the multiple rodenticide stations.

92.     The implication of Bridgeo's message to Ms. Wong was unmistakable:  he was bothered that she had brought her concerns directly to the CEO or COO, thereby undermining the recommendations he had made, and he was reprimanding her for overstepping what he thought were the limits of her authority as GC and raising concerns which he had already rejected.

93.    Upon information and belief, Bridgeo took a number of his team members to dinner in London on that Wednesday evening (after his admonishment over Slack to Ms. Wong). This group included Veson's Controller and a Vice President of Finance.

94.    Upon information and belief, at this dinner, Bridgeo informed his team of actions that he intended to take (and did, as discussed below) related to Ms. Wong's rodent concerns. Ms. Wong and Bridgeo returned from London at the end of that week.

95.    Throughout the following week of January 29, 2024, Bridgeo continued to take actions to undermine Ms. Wong's professional authority and scope of responsibilities. [*Second sentence omitted pending resolution of any confidentiality or privilege concerns the Company may have.*]

96.    As a result, Ms. Wong sought out Riley and complained about Bridgeo's treatment of her. Ms. Wong specifically raised the reprimand that she had received from Bridgeo the week prior for discussing her concerns about the rodents with Riley, Bridgeo's exclusion of Ms. Wong from responsibilities within her purview as GC, and Bridgeo's "offer" to meet with Ms. Wong's legal team while she was recovering from surgery in October/November 2023. These discussions between Ms. Wong and Riley occurred on or about Monday, January 29, 2024 and again on or about Thursday, February 1, 2024.

97.    Riley offered to speak with Bridgeo on her behalf, but, given Bridgeo's well-established perception of her as someone who should be subordinate, she did not want him to think she needed another male executive to step in for her. Ms. Wong told Riley that she would address Bridgeo directly, herself.  She had planned to spend a few days determining how best to approach Bridgeo in a discussion so that a cordial working relationship could be preserved.

98.     Unfortunately, as discussed below, Bridgeo's threatening conduct just days later prevented this discussion from ever happening.

### Bridgeo's Malicious, Discriminatory, and Harassing Rat "Prank" and Veson's Condoning and Support of His Actions

99.     On Tuesday, February 6, 2024, Veson's Boston office was full of employees because the Company was kicking off its "Spirit Week." Employees were all encouraged to come into the office that day and join a call where they would simultaneously open a box full of Veson-branded items.

100.     Having that many people present in-person at the same time was not typical for most departments, since the Company had adopted a hybrid-work policy following the COVID pandemic. (The local members of the legal team, including Ms. Wong, were in the office consistently, as she strongly believed that an in-person presence was critical to the legal team's relationships with their internal clients. In a senior leadership meeting discussion about company culture and presence in the office, the CEO had observed that Ms. Wong's team set the standard he wanted the rest of the teams to meet.)

101.     The Spirit Week call began at 9:00 a.m. Due to traffic conditions, Ms. Wong walked into the Boston office a little after 9:00 a.m. that day. She observed that a colleague was seated at almost every desk in the open office space immediately outside her office.

102.     Because Ms. Wong was a few minutes late in joining the call, she logged into the call while trying to open the box of presents that was on her desk. As she peeled off the packing tape, she turned to throw it into the trash bin immediately behind her desk chair.

103.     Ms. Wong paused, frozen, as she looked into her trash bin. She was horrified and shocked to see what appeared to be a large rat in the bottom of the trash bin. It took her several

moments to realize that the rat was not, in fact, real. Rather, it was an incredibly realistic-looking stuffed rat. See Exhibit 1.

104.    Given his prior comments and admonishments, she immediately knew it was Bridgeo who had placed the "rat" in her office. Trying not to betray her shock, she confronted Bridgeo, who laughed while he admitted hiding the rat in her trash bin.

105.    This "rat" as used against Ms. Wong is incredibly offensive as it was used: (1) to frighten her in line with the trope of women being afraid of rats; (2) to intimidate and punish her her for being a "rat" who had mentioned her concerns about the building; (3) to diminish her ability and authority to communicate directly with the CEO and COO at her professional discretion; and, (4) to publicly demean and humiliate her in front of work colleagues, including direct reports and peers.

106.    Shortly after Ms. Wong discovered the rat in her trash bin, she received the following message from Unflat, the Company's CPO, with Bridgeo copied: "Levina, did you want to submit a ticket to maintenance/housekeeping??" with a laughing emoji. Apparently, at some point, Bridgeo had publicized to the CPO that he had done this. Rather than address the conduct appropriately, the CPO permitted and perpetuated it.

107.    As Ms. Wong continued her workday, she found a second rat strategically hidden inside her desk.

108.    About an hour after the discovery of the first rat in her trash bin, Ms. Wong joined a previously scheduled video call with Unflat. At the start of the call, Unflat again referred to the rats in Ms. Wong's office in a joking manner.

109.    Choking back tears, Ms. Wong shook her head and told Unflat, "I don't find this funny."

110.     Unflat immediately apologized. To avoid further discussion of how she had been demeaned, Ms. Wong quickly moved on and focused on the original purpose of the call and proceeded to continue to focus on her professional responsibilities for the rest of the day.

111.     At another point that day, Bridgeo barged into Ms. Wong's office, without invitation or waiting for permission to enter and without regard to the fact that she was sitting at her desk, to fish the rat out of the trash bin.

112.     He proceeded to parade the rat around the office and show it to others while laughing, and he then placed it in the open office area atop a cabinet that was normally used for team members to share treats brought in from home.

113.     When Ms. Wong saw Riley in the office kitchen later that day, she asked if he had heard of the rats in her office. He affirmed that he had, and he then said, "The question is whether [she had] a sense of humor?"

114.     Riley's callous response was a variation of how women are told to "smile more" or "learn how to take a joke" when faced with male misconduct, and how such misconduct is excused and downplayed by asserting that it's "boys just being boys."

115.     Upon information and belief, in the middle of that day, Bridgeo again entered Ms. Wong's office, without permission or any legitimate business purpose, and placed a third rat into her personal work bag. Upon information and belief, he did this in the presence of a Veson Senior Manager that Bridgeo had invited specifically to witness how he, Bridgeo, was going to further harass Ms. Wong.

116.     Because this was a deep bag and Bridgeo placed the rat at the bottom, see Exhibit 1, it was not until days later that Ms. Wong reached in and felt the rat – revictimizing her. She was

immediately appalled and disgusted. She had a hard time bringing herself to even touch the stuffed rat to remove it from her bag.

117.    The following day, Wednesday, February 7, 2024, Ms. Wong arrived at the office to find that the rat placed on the office cabinet was still there on display, as a symbol of Bridgeo's intent to humiliate and harass Ms. Wong.

118.    Ms. Wong contacted Unflat via Slack, requesting a meeting. Unflat responded that she was available for an appointment late that afternoon.

119.    Shortly after arriving at the office, Ms. Wong and her Legal Assistant were in the office kitchen space, discussing the distressing events from the previous day.

120.    Mr. Veson, the Company's founder and CEO, entered the space, and Ms. Wong asked for a private word with him in his office.

121.    During that meeting, Ms. Wong described to Mr. Veson the "prank" that Bridgeo had played on her. Although she tried to remain dispassionate and professional in front of Mr. Veson, Ms. Wong had trouble holding back her tears.

122.    Mr. Veson reacted with confusion, asking, "How is that funny?"

123.    Ms. Wong assured him that the prank, indeed, was not funny. She informed Mr. Veson that she wanted him to be aware of the situation, and that she would be speaking with Unflat later that day about next steps.

124.    Ms. Wong spent most of the rest of that day secluded in her office, in tears.

125.    At some point in the afternoon, Ms. Wong managed to stop crying and opened the door to her office. Bridgeo and his direct report, a Vice President of Finance, approached her office door and mockingly asked, "Any more rats?"

126.     When Ms. Wong replied, "I don't find this funny," Bridgeo merely walked away, without offering any word of apology. (Only after she discovered the third rat, the one that had been hidden in her personal bag, did she realize that Bridgeo had asked "Any more rats?" because he was expecting to have another episode of showing his dominance over her by humiliating and demeaning her in front of a colleague.)

127.     To say that Ms. Wong was distressed to find numerous rats methodically hidden throughout her office in an attempt to threaten and harass her – including in private, personal places like her personal bag and inside her desk – is a massive understatement. Beyond feeling targeted, harassed, humiliated, and distressed, she also felt physically threatened, intimidated, and violated.

128.     Ms. Wong later learned that Bridgeo did not act impulsively or alone.

129.     Upon information and belief, Bridgeo had discussed his plan beforehand with other members of Veson's leadership team, including Riley, Unflat, the Controller, the Vice President of Finance, and the Senior Vice President of Professional Services. Upon information and belief, at least two of these individuals questioned his judgment about the "prank," yet they did nothing to dissuade him from carrying it out.

### Ms. Wong's Complaint of Discrimination to Veson and the Company's Failure to Take Adequate Corrective Actions

130.     In the late afternoon of Wednesday, February 7, 2024, Ms. Wong met with Unflat, the CPO, and complained that Bridgeo's conduct was unlawful harassment and discrimination.

131.     In addition to the rat incident the previous day, Ms. Wong informed Unflat of Bridgeo's prior and ongoing efforts to undermine her position and authority as GC (as discussed above). Ms. Wong continued by explaining to Unflat that once that initial shock wore off, she felt traumatized and humiliated and had spent most of the day (Wednesday) crying in her office.

132.    On Thursday, February 8, 2024, despite having planned to go into the office for an in-person senior leadership meeting, Ms. Wong worked from home because she was unable to compose herself at the thought of having to be in the same room as Bridgeo.

133.    Later that day, Ms. Wong met with Riley via a video call for their regularly-scheduled one-on-one meeting. She remained off camera, however, as she was still unable to maintain her composure when discussing the situation with Riley.

134.    Following her February 7, 2024 complaint to Unflat, Veson retained a third-party investigator to investigate the matter. Unflat directed Ms. Wong to continue to work from home until the completion of the investigation.

135.    Ms. Wong was eventually allowed to return to the office while Bridgeo was away on vacation in mid-February.

136.    On or about February 13, 2024, as the investigation was ongoing, Ms. Wong met with Unflat and disclosed that she had retained counsel, as she felt that it would be less detrimental to her relationships with Riley and Bridgeo if third parties could handle the matter. Ms. Wong sincerely hoped that the Company would handle the matter in a way that would allow everyone to move forward; it did not.

137.    The humiliation and harassment of Ms. Wong continued for weeks after the February 6, 2024 rat incident.

138.    During the last week of February, a Veson Vice President based in London, who had been present during the office tours, was in Boston for in-person meetings. He approached Ms. Wong at a dinner hosted by the Company and, unaware of the ongoing HR investigation, jokingly said, "I hear there were some rats in your office?"

139.     In the weeks following the incident, Ms. Wong continued to meet with her direct supervisor, Riley, at pre-scheduled, weekly, one-on-one meetings. During those meetings, Ms. Wong confirmed with Riley that, as the Company's GC, it was a requirement of her job that she work well with all Company executives, including Bridgeo, despite his harassment and bullying.

140.     To the best of her knowledge, Veson never disciplined or took any other adverse action against Bridgeo for his conduct, and none of the employees who colluded with Bridgeo were disciplined for their participation or acquiescence, either.

### *Defendants' Retaliation Against Ms. Wong for Complaining About Bridgeo*

141.     Instead of taking any adverse action towards Bridgeo or the other employees involved, Veson retaliated against Ms. Wong for complaining about his misconduct and actively disregarded her attempts to try to salvage the situation.

142.     In the week following the discovery of the rats hidden throughout her office, Ms. Wong requested to have Bridgeo's office relocated away from hers.

143.     At the time, Bridgeo was located in an office directly across from hers and could see into her office. The idea of working across from him, when he had already invaded her office and violated her privacy (both individually and as the Company's GC) made her physically ill and triggered a PTSD-like response, which Ms. Wong explained to Veson as the basis for her request.

144.     Ms. Wong also requested that a lock be placed on her office door if the Company was unable to move Bridgeo's office by the time he returned to the office from his vacation. As the basis for her request for a lock, Ms. Wong reminded the CPO that Bridgeo had entered into her office without permission and with the sole purpose of unlawful harassment/discrimination and violating her designated personal space.

145.    Veson initially responded to these eminently reasonable requests by informing Ms. Wong that it was worried about the optics of moving Bridgeo's office. In other words, Veson was more concerned about protecting Bridgeo's image than in protecting Ms. Wong from Bridgeo and preventing continued unwelcome and unlawful conduct and harm by him.

146.    By the time that Bridgeo returned to the office from his vacation in the last week of February, the Company had not yet provided a lock for Ms. Wong's office or relocated Bridgeo's office, despite having a number of open offices available in other parts of the Boston office.

147.    Consequently, when Ms. Wong and Bridgeo were in the Boston office at the same time, Ms. Wong was forced to temporarily move herself to a separate part of the office, isolated from her team, which diminished the team's ability to collaborate informally – a critical component of a successful legal team. In some of those instances, her team members temporarily relocated with her so as not to disrupt their work.

148.    The Company ultimately stalled until the end of the March 2024 to relocate Bridgeo, on terms that diminished Ms. Wong's reputation and access to other executives (described below), and it never provided a lock for Ms. Wong's office door.

149.    Prior to February 2024, Ms. Wong and her legal team were co-located with Bridgeo and his team, the CPO (Unflat) and her team, and the Marketing and Sales teams. As part of relocating Bridgeo's team, the CPO decided to also move her team with the excuse that "they view confidential information" and should be in a more secluded spot. (Of course, the legal team also routinely views confidential information.)

150.    Upon information and belief, Veson encouraged Unflat and her team to relocate along with Bridgeo and his team to avoid the appearance that Bridgeo had been disciplined or singled out in any way for his misconduct.

151.    Thus, both Bridgeo's team and Unflat's team were physically relocated to a new location in the office. To access their new location, one needs to exit one space and enter another with a key card. Their new location also happens to be where the CEO and COO have offices. In return, the Company relocated the Professional Services team to sit in proximity to the legal team.

152.    As a result of all this shuffling, Ms. Wong's team no longer sat in close physical proximity to any of the C-level executives, and Bridgeo and his team were rewarded with increased visibility and access to the most senior leaders of the Company.

153.    Ms. Wong and her team were unable to collaborate with the other executives as readily or effectively.

154.    Furthermore, this resulted in fewer opportunities for informal collaboration between Ms. Wong (and her team) with senior executives who might have, in the past, been in that area of the office to confer with the CPO. Members of Ms. Wong's team also felt isolated and noticed the lack of C-level exposure.

155.    Moreover, the clear signal to the rest of the employees in the Boston office was that Ms. Wong and the legal team had been exiled and were no longer respected by the most senior executives, which undermined confidence in the legal team's value to the Company.

156.    Veson also painted Ms. Wong as difficult after the rat incident because she did not want to work in an office right next to Bridgeo and or participate in meetings with him until after he had participated in training or coaching.

157.    In further retaliation for having complained about Bridgeo's gender-based discrimination towards her, Unflat unfairly chastised Ms. Wong in March 2024 for supposedly not keeping HR involved in a situation where Ms. Wong had, in fact, copied HR on communications.

[*Paragraphs 158-163 omitted pending resolution of any confidentiality or privilege concerns the Company may have*.]

164.    Following Bridgeo's example of exclusionary behavior and in retaliation for having dared to complain about Bridgeo's discriminatory treatment of her, HR also kept Ms. Wong and her team from certain issues which clearly were under her purview.  [*Second sentence omitted pending resolution of any confidentiality or privilege concerns the Company may have.*]

[*Paragraphs 165-166 omitted pending resolution of any confidentiality or privilege concerns the Company may have.*]

### The Effects of Defendants' Unlawful Conduct on Ms. Wong's Health, Her Subsequent Leave, and Veson's Failure to Accommodate Her Medical Condition

167.    Meanwhile, as the result of the unlawful conduct, Ms. Wong was suffering severe emotional and physical effects, including extreme anxiety, gastrointestinal issues, tension headaches, upper back pain, jaw pain, and insomnia.

168.    As a result, she sought medical help and was diagnosed with situational PTSD-like symptoms that made it extremely difficult for her to work in physical proximity to Bridgeo or even in his virtual presence.

169.    Ms. Wong took a leave of absence, from April 8 – 30, 2024, in order to seek treatment for her symptoms. Veson designated and approved this as leave under the Family and Medical Leave Act of 1993 ("FMLA").

170.    Ms. Wong returned to the office on May 1, 2024, at the end of her FMLA leave.

171.    Immediately prior to her return (on April 30, 2024), Ms. Wong reached out to the COO and HR and requested that Veson attempt to improve and accommodate the situation by retaining a mediator to help manage her relationship with Bridgeo going forward. Ms. Wong had hoped that using a mediator would enable the workplace to change in a way that would allow her to comfortably perform her job duties in person with Bridgeo.  Unfortunately, Veson utterly failed to accommodate her request or engage in any further diaglogue about her requested accommodation, as explained below.

172.    As part of her request, Ms. Wong introduced Veson to a potential mediator. Unflat mentioned to Ms. Wong that she also had a mediator in mind. Riley indicated that he was receptive to this proposal, as well.

173.    However, after Veson's initial superficial response that the Company was open to using a mediator to try to ameliorate the work environment and accommodate Ms. Wong's ongoing PTSD-like symptoms, Veson never followed up with Ms. Wong at all about her mediator proposal.

174.    To Ms. Wong's knowledge, Veson never engaged a mediator.

175.    Furthermore, after the rat incident, Ms. Wong had informed Riley that she did not want to have any interactions with Bridgeo unless they were in a group setting because she felt physically ill and emotional in his presence. Even though Veson knew that Ms. Wong's PTSD-like symptoms continued to be triggered during meetings with Bridgeo or when he reached out to her directly on a one-on-one basis, Veson failed to assist her.

176.    For example, Ms. Wong had a meeting scheduled with Riley – and only Riley – shortly after her return from her FMLA leave. When she walked to Riley's office at the scheduled

meeting time, she could see through the glass window that Bridgeo was in there. The thought of any unexpected contact with Bridgeo was unsettling to her.

177.    Consequently, Ms. Wong walked away and waited for Bridgeo to leave Riley's office. After waiting for several minutes beyond the designated meeting time, she steeled herself to walk to the office to confirm whether the meeting time would still work, or to offer to reschedule given that Bridgeo was still there.

178.    Riley responded that Bridgeo was in his office in order to participate in the meeting that was intended to be between himself and Ms. Wong only.

179.    Following that unanticipated encounter with Bridgeo, Ms. Wong specifically requested prior notice from Riley when Bridgeo was going to attend a meeting with her, stating "Despite my professional demeanor in meetings where [Bridgeo] is present (and where I expected him to be present), his presence is still unsettling, as he is still the person who left rats in my office."

180.    In short, the Company failed to reasonably accommodate Ms. Wong's request for a mediator, it failed to assist her in avoiding situations with Bridgeo where her PTSD-like symptoms would be triggered, and it failed to engage in an interactive dialogue or identify an alternative accommodation that would allow her to perform the essential functions of her job going forward.

181.    The Company instead exacerbated her PTSD-like symptoms by minimizing, ignoring, and affirmatively intensifying her concerns about interacting with Bridgeo as if nothing had happened.

182.    Ms. Wong (and her legal team) continued to be physically isolated from the senior executives and leadership team due to the decision to relocate Unflat and her team away

from Ms. Wong and her team, which resulted in less day-to-day involvement in the Company's business decisions and fewer opportunities for informal interactions.

183.    The isolation negatively impacted morale on the legal team as well.

184.    The Company failed to take prompt or effective action to remedy the threatening and hostile work environment created and perpetuated by Bridgeo. To the contrary, the Company retaliated against Ms. Wong for complaining by isolating her at work and forcing her to interact with Bridgeo, her harasser, as if no misconduct had happened.

### *Ms. Wong is Constructively Discharged Because of the Cumulative Effects of Defendants' Unlawful Discrimination and Retaliation*

185.    The Company further discriminated and retaliated against Ms. Wong by interfering with her and her team's ability to render legal advice on several HR matters.

186.    Following Bridgeo's example, HR excluded Ms. Wong and her team from certain issues which should have involved the legal function, which served to diminish Ms. Wong's ability to properly manage risk to the Company – a key responsibility for Veson's GC – and opened her up to blame for others' shortcomings.

[*Paragraphs 187-198 omitted pending resolution of any confidentiality or privilege concerns the Company may have.*]

199.    In short, Defendants' undermining and retaliatory behavior hindered Ms. Wong's ability to effectively perform her role as Veson's GC and left her vulnerable to unmerited criticism of her judgment and professional abilities.

200.    Moreover, the Company's continued inaction and failure to follow up for weeks after Ms. Wong requested that Veson engage a mediator made it clear that Veson would not provide any reasonable accommodations for Ms. Wong's situational PTSD-like symptoms, which

persisted upon her forced interactions with Bridgeo and diminished her ability to carry out her duty to work well with a Company executive.

201.    Bridgeo's conduct, the Company's failure to hold Bridgeo accountable, the Company's failure to accommodate Ms. Wong's request for a mediator or to take any meaningful steps to improve the work environment following the rat incident, and Veson's retaliatory conduct created intolerable working conditions that no reasonable person could be expected to endure.

202.    Consequently, Ms. Wong was compelled to resign from the Company on June 20, 2024.

203.    Due to practical considerations (i.e., to continue uninterrupted health care coverage for her son), and because she felt ethically obligated as Veson's GC to provide the Company with a smooth transition time and so as to not allow Veson's and Bridgeo's conduct to further damage her career, Ms. Wong continued to work at the Company through the beginning of July 2024, giving a little over two (2) weeks' notice before her departure.

204.    On July 23, 2024, Ms. Wong filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the United States Equal Employment Opportunity Commission ("EEOC").

205.    On October 21, 2024, 90 days after cross-filing her Charge with the MCAD and the EEOC, Ms. Wong withdrew the Charge in order to file the instant court complaint.

206.    On October 10, 2024, Ms. Wong filed a complaint with the Massachusetts Attorney General's Office regarding Veson's interference with her use of paid earned sick time in violation of the Earned Sick Time law. She simultaneously requested permission to file a private right of action, which was granted on October 10, 2024. As a result of Defendants' unlawful conduct, Ms. Wong has suffered and will continue to suffer damages including, but not limited to

emotional distress damages, compensatory damages, monetary damages, punitive damages, attorneys' fees, and costs, all in an amount to be determined at trial.

## COUNT I
### (Intentional Infliction of Emotional Distress – Against Bridgeo)

207.    Ms. Wong hereby repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 206 above as if set forth fully herein.

208.    Bridgeo was only a co-worker of Ms. Wong's and had no supervisory authority over her during the time that she worked for Veson.

209.    Upon information and belief, Bridgeo intended to inflict emotional distress on Ms. Wong when he hid multiple realistic-looking rats in her office and in her personal belongings and then paraded and displayed one around the office to further publicly humiliate her, or he knew or should have known that emotional distress would be the likely result of his conduct.

210.    Bridgeo's conduct was extreme and outrageous, beyond all bounds of decency, and utterly intolerable in a civilized community.

211.    Bridgeo's conduct caused emotional distress to Ms. Wong.

212.    The emotional distress sustained by Ms. Wong was severe and of a nature that no reasonable person could be expected to endure it.

213.    Bridgeo's conduct in making light of Ms. Wong's concerns about the impact of a rodent infestation on Veson and in maliciously hiding rats throughout Ms. Wong's office and personal belongings and then further humiliating her was in no way within the scope of his employment with Veson, and it was unrelated to the legitimate business interests of Veson.

214.    As a direct and proximate cause of Bridgeo's malicious conduct, Ms. Wong has suffered and will continue to suffer damages including, but not limited to emotional distress damages, compensatory damages, and monetary damages in an amount to be determined at trial.

## COUNT II
**(Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* – Against Veson)**

215.    Ms. Wong hereby repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 214 above as if set forth fully herein.

216.    Ms. Wong is a woman.

217.    Ms. Wong was subject to unwelcome harassment by her co-worker, Bridgeo, on the basis of her sex (female). The harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment. The harassing conduct was both objectively offensive to a reasonable person and subjectively offensive to Ms. Wong.

218.    The Company is liable for Bridgeo's unlawful harassment of Ms. Wong because it knew about his discriminatory harassing behavior, yet it failed to exercise reasonable care to prevent and promptly correct such behavior.

219.    Ms. Wong was subjected to a harassing and hostile work environment by the Company and Bridgeo and eventually constructively discharged in a discriminatory and retaliatory manner because of her sex (female).

220.    Ms. Wong was subjected to a harassing and hostile work environment by the Company and Bridgeo and eventually constructively discharged in a discriminatory and retaliatory manner because she engaged in protected activity including, but not limited to, raising concerns about unlawful sex discrimination and/or harassment in the workplace.

221.    Ms. Wong has suffered and will continue to suffer damages including, but not limited to emotional distress damages, compensatory damages, monetary damages, punitive or multiple damages, attorneys' fees, and costs, all in an amount to be determined at trial.

## COUNT III
### (Violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 1201 *et seq.* – Against Veson)

222.    Ms. Wong hereby repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 221 above as if set forth fully herein.

223.    Ms. Wong is disabled under the ADA because her situational PTSD-like symptoms are an impairment that substantially limit her ability to perform the major life activities of sleeping and working. Furthermore, Veson regarded Ms. Wong as disabled because of her situational PTSD-like symptoms.

224.    Ms. Wong is qualified to perform the essential functions of the GC and Chief Privacy Officer position at Veson with a reasonable accommodation.

225.    Veson discriminated against Ms. Wong on the basis of her disability when it failed to provide her with a reasonable accommodation, including when it failed to engage in an interactive, good faith dialogue or identify an alternative accommodation. Veson's failure to accommodate her disability also contributed to her constructive discharge.

226.    As a result of Veson's unlawful conduct, Ms. Wong has suffered and will continue to suffer damages including, but not limited to emotional distress damages, compensatory damages, monetary damages, punitive or multiple damages, attorneys' fees, and costs, all in an amount to be determined at trial.

## COUNT IV
### (Violation of Massachusetts Fair Employment Practice Act, Mass. Gen. Laws ch. 151B – Against Veson and Bridgeo)

227.    Ms. Wong hereby repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 226 above as if set forth fully herein.

228.    Ms. Wong is a woman.

229.     Ms. Wong was subjected to unwelcome harassment by Bridgeo – with the rat prank being the most egregious incident – on the basis of her sex (female). The harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment. The harassing conduct was both objectively offensive to a reasonable person and subjectively offensive to Ms. Wong.

230.     Ms. Wong was subjected to a harassing and hostile work environment by the Company and Bridgeo and eventually constructively discharged in a discriminatory and retaliatory manner because of her sex (female).

231.     Ms. Wong was subjected to a harassing and hostile work environment by the Company and Bridgeo and eventually constructively discharged in a discriminatory and retaliatory manner because she engaged in protected activity including, but not limited to, raising concerns about unlawful discrimination and/or harassment in the workplace.

232.     In addition, Ms. Wong is handicapped under Chapter 151B because her situational PTSD-like symptoms are an impairment that substantially limit her ability to perform the major life activities of sleeping and working. Furthermore, Veson regarded Ms. Wong as handicapped because of her situational PTSD-like symptoms.

233.     Ms. Wong is qualified to perform the essential functions of the GC and Chief Privacy Officer position at Veson with a reasonable accommodation.

234.     Veson discriminated against Ms. Wong on the basis of her handicap when it failed to provide her with a reasonable accommodation, including when it failed to engage in an interactive, good faith dialogue or identify an alternative accommodation. Veson's failure to accommodate her handicap also contributed to her constructive discharge.

235.     Veson discriminated against Ms. Wong on the basis of her disability when it failed to provide her with a reasonable accommodation, including when it failed to engage in an interactive dialogue or identify an alternative accommodation. This failure to accommodate also contributed to her constructive discharge.

236.     Ms. Wong has suffered and will continue to suffer damages including, but not limited to emotional distress damages, compensatory damages, punitive or multiple damages, attorneys' fees, and costs, all in an amount to be determined at trial.

## COUNT V
**(Violation of Massachusetts Earned Sick Time Law, Mass. Gen. Laws ch. 149, § 148C – Against Veson)**

237.     Ms. Wong hereby repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 236 above as if set forth fully herein.

238.     Ms. Wong was scheduled to use earned sick time in late October/early November 2023 to undergo surgery related to a cancer diagnosis and to recover.

239.     In the weeks leading up to her scheduled leave, Ms. Wong worked with her legal team and Veson's COO (the executive to whom she and her team reported) to transition matters appropriately. On Ms. Wong's last day in the office prior to the surgery, Bridgeo made a veiled threat to take over her team and diminish her professional responsibilities while she was out on sick leave.

240.     Bridgeo's threat unlawfully interfered with Ms. Wong's use of her earned sick time in that Ms. Wong was so concerned that he would effectively oust her while she was recovering from surgery that she was back in communication with her team within a few days, earlier than planned.

241.    Ms. Wong has suffered and will continue to suffer damages including, but not limited to emotional distress damages, compensatory damages, monetary damages, punitive or multiple damages, attorneys' fees, and costs.

### COUNT VI
**(Violation of Massachusetts Paid Family and Medical Leave Act, Mass. Gen. Laws ch. 175M – Against Veson)**

242.    Ms. Wong hereby repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 241 above as if set forth fully herein.

243.    Ms. Wong's scheduled leave in late October/early November 2023 to undergo surgery related to a cancer diagnosis and to recover qualified for leave under the Massachusetts Paid Family and Medical Leave Act.

244.    In the weeks leading up to her scheduled leave, Ms. Wong worked with her legal team and Veson's COO (the executive to whom she and her team reported) to transition matters appropriately. On Ms. Wong's last day in the office prior to the surgery, Bridgeo made a veiled threat to take over her team and diminish her professional responsibilities while she was out on her medical leave.

245.    Bridgeo's threat unlawfully interfered with Ms. Wong's use of her medical leave under the PFMLA in that Ms. Wong was so concerned that he would effectively oust her while she was recovering from surgery that she was back in communication with her team within a few days, earlier than planned.

246.    Ms. Wong has suffered and will continue to suffer damages including, but not limited to emotional distress damages, compensatory damages, monetary damages, punitive or multiple damages, attorneys' fees, and costs, all in an amount to be determined at trial.

<u>COUNT VII</u>
**(Tortious Interference with Advantageous Business Relations – Against Bridgeo)**

247.    Ms. Wong hereby repeats, realleges and incorporates by reference the allegations in paragraphs 1 through 246 above as if set forth fully herein.

248.    An advantageous business relationship existed between Ms. Wong and Veson, in that she was employed by Veson as its GC and Chief Privacy Officer.

249.    Bridgeo was aware of this advantageous business relationship.

250.    Bridgeo knowingly and intentionally induced a breach or break of that relationship when he repeatedly undermined Ms. Wong's authority and prevented her from carrying out her responsibilities as Veson's GC and Chief Privacy Officer, and when he created such a discriminatory, hostile working environment – culminating in the rat prank – that Ms. Wong was forced to resign.

251.    Bridgeo's interference with Ms. Wong's advantageous business relationship with Veson was primarily motivated by actual malice – a spiteful, malignant purpose distinct from any legitimate business interest of Veson. Indeed, by undermining and diminishing Ms. Wong's authority, effectiveness, and responsibilities as Veson's GC, Bridgeo was acting against Veson's interests. Accordingly, Bridgeo's interference involved an improper motive or means.

252.    Bridgeo's interference led to Ms. Wong's constructive discharge and prevented Ms. Wong from receiving the benefits of her continued employment with Veson including, but not limited to, an award of equity as set forth in a Class B Units Award Letter (dated October 25, 2022) from Veson's parent company.

253.    As a direct and proximate cause of Bridgeo's conduct, Ms. Wong has suffered and will continue to suffer damages including, but not limited to emotional distress damages, compensatory damages, and monetary damages in an amount to be determined at trial.

## JURY DEMAND

Ms. Wong hereby demands a jury trial as to all claims so triable.

## PRAYER FOR RELIEF

For the reasons set forth above, Plaintiff Levina Wong respectfully requests that the Court enter judgment entered in her favor and against Veson and Bridgeo on all claims against them as follows:

a.    For compensatory damages and any other damages (including punitive or multiple damages) to which Ms. Wong is entitled in an amount to be shown at trial;

b.    For Ms. Wong's attorneys' fees;

c.    For pre- and post-judgment interest and costs of suit incurred herein; and

d.    For such further relief as the Court finds just and proper.

Respectfully submitted,

LEVINA WONG

By her attorneys,

/s/*Nicole Corvini*
Nicole Corvini, BBO No. 670587
*ndaly@beckreed.com*
Heather Carlson Krauss, BBO No. 644457
*hkrauss@beckreed.com*
BECK REED RIDEN LLP
155 Federal Street, Suite 1302
Boston, Massachusetts 02110
Telephone: (617) 500-8660
Facsimile: (617) 500-8665

Dated: October 30, 2024

## **VERIFICATION**

The undersigned, Plaintiff Levina Wong, has personal knowledge of the facts set forth in the above Complaint and hereby certifies that all of said facts are true, except such facts as are alleged upon information and belief, which facts she believes to be true.

Signed under the pains and penalties of perjury this _28_ day of October 2024.

DocuSigned by:

*Levina Wong*

E7EA3E416635416...

Levina Wong